# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**JAMES SALLIS,**

        **Plaintiff,**

    **v.**                              **Case No. 06-C-1193**

**MICHAEL ASTRUE,**
**Commissioner of the Social Security Administration,**
                **Defendant.**

---

## DECISION AND ORDER

Plaintiff James Sallis applied for social security disability benefits, alleging that he was unable to work due to back and wrist pain, complications of diabetes, asthma, depression and other health problems. The Social Security Administration ("SSA") denied his claim, as did an Administrative Law Judge ("ALJ") following a hearing. Plaintiff now seeks judicial review of the denial pursuant to 42 U.S.C. § 405(g).

## I. APPLICABLE LEGAL STANDARDS

### A.    Judicial Review Standard

Under § 405(g), the district court's review is limited to determining whether the ALJ's decision is supported by "substantial evidence" and free of harmful legal error. Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000). Thus, where conflicting evidence would allow reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ. Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997). If the ALJ commits an error of

law, however, reversal is required without regard to the volume of evidence in support of the factual findings.  Id.  The ALJ commits such an error if she fails to comply with the Commissioner's regulations and rulings.  See Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991).

**B.    Disability Standard**

The SSA has adopted a sequential five-step test for determining whether a claimant is disabled.  Under this test, the ALJ must determine: (1) whether the claimant is presently unemployed; (2) if so, whether the claimant has a severe impairment or combination of impairments;[1] (3) if so, whether any of the claimant's impairments are listed by the SSA as being presumptively disabling;[2] (4) if not, whether the claimant possesses the residual

---

[1]An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).

[2]These impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings").  In order to meet a Listing, the claimant must satisfy its specific "criteria."  For example, the Listings of mental impairments consist of three sets of criteria: the paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain Listings).  The paragraph A criteria substantiate medically the presence of a particular mental disorder.  The criteria in paragraphs B and C describe the impairment-related functional limitations that are incompatible with the ability to work.  Windus v. Barnhart, 345 F. Supp. 2d 928, 931 (E.D. Wis. 2004).  There are four broad areas in which the SSA rates the degree of functional limitation: (1) activities of daily living ("ADL's"); (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).  The SSA rates the degree of limitation in the first three functional areas using a five-point scale: none, mild, moderate, marked and extreme.  The degree of limitation in the fourth area is evaluated using a four-point scale: none, one or two, three, and four or more.  The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.  § 404.1520a(c)(4).  Certain Listings may also be met if the claimant has marked limitations in two areas.  See, e.g., 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B).  On the other hand, if the ALJ rates the degree of limitation as "none" or "mild," she may generally find that the claimant has no severe mental impairment.  § 404.1520a(d)(1).

2

functional capacity ("RFC") to perform his past work;[3] and (5) if not, whether the claimant is able to perform any other work. <u>Young v. Barnhart</u>, 362 F.3d 995, 1000 (7th Cir. 2004). The claimant carries the burden at steps one through four, but if he reaches step five, the burden shifts to the SSA to establish that the claimant is capable of performing other work in the national economy. <u>Zurawski v. Halter</u>, 245 F.3d 881, 886 (7th Cir. 2001). The SSA may carry this burden by either relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of his limitations, or through the use of the "Medical-Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education and work experience. <u>E.g.</u>, <u>Masch v. Barnhart</u>, 406 F. Supp. 2d 1038, 1041-42 (E.D. Wis. 2005).

## II. FACTS AND BACKGROUND

### A.    Procedural History

Plaintiff first applied for benefits on May 7, 1999, alleging a disability onset date of November 20, 1997. The SSA denied the application initially on August 13, 1999, and on reconsideration on January 26, 2000, and plaintiff did not pursue the matter further. (Tr. at 17; 56; 58; 136.) On March 7, 2000, plaintiff was awarded a non-service-connected disability pension by the Veterans' Administration ("VA"), with an eligibility date of June 16, 1999. (Tr. at 298-303.)

On February 14, 2001, plaintiff filed another application for benefits with the SSA, again alleging an onset date of November 20, 1997. (Tr. at 142.) This application was also denied initially and on reconsideration. (Tr. at 59; 60.) This time around, plaintiff requested a hearing

---

[3]RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of his impairments. SSR 96-8p.

before an ALJ (Tr. at 107), and on December 6, 2002, he appeared with counsel before ALJ Margaret O'Grady. At the hearing, plaintiff amended the onset date to June 16, 1999, consistent with the VA determination. In a decision dated May 13, 2003, the ALJ denied the claim. (Tr. at 65-71.) Plaintiff appealed to the Appeals Council, which vacated the decision and remanded, directing the ALJ to provide a function-by-function assessment of plaintiff's physical abilities, with specific citations to the record, and further evaluate his ability to use his hands repetitively. (Tr. at 18; 117-18.)

On remand, the ALJ received additional records and held another hearing, at which plaintiff, again represented by counsel, testified. The ALJ also heard from a vocational expert. On December 14, 2005, the ALJ issued another unfavorable decision. The ALJ first noted that, notwithstanding plaintiff's amendment of the onset date, res judicata precluded a finding that he was disabled prior to January 27, 2000, the date after plaintiff's previous application was finally denied. The ALJ acknowledged that she could re-open the earlier application but found no good cause for doing so. (Tr. at 19.) Second, the ALJ noted that plaintiff's insured status ended on December 31, 2002, which meant that he had to establish disability prior to that date.[4] Therefore, the ALJ focused on the records from January 27, 2000 to December 31, 2002. (Tr. at 20.)

The ALJ found that plaintiff was not employed and had severe impairments, including

---

[4]A disabled individual may apply for disability insurance benefits ("DIB") or supplemental security income ("SSI"). DIB is payable only if the claimant becomes disabled while in "insured status," which generally requires that he have earned a minimum amount in twenty of the previous forty quarters. See 20 C.F.R. § 404.130 (setting forth methods of determining insured status). SSI is payable regardless of the claimant's insured status so long as he satisfies a means test. See Splude v. Apfel, 165 F.3d 85, 89 (1st Cir. 1999). Because of his receipt of VA benefits, plaintiff apparently did not satisfy the means test. Therefore, he was eligible only for DIB.

4

back pain, chronic obstructive pulmonary disease, a history of substance abuse, obesity, various musculo-skeletal complaints, and diabetes, none of which met or equaled a Listed impairment. (Tr. at 25.) She found that plaintiff had no severe mental impairment. She then determined that he retained the RFC for simple, unskilled, sedentary work with no exposure to pulmonary irritants, only occasional crouching, stooping, kneeling or crawling, and no more than frequent (not constant) use of the hands. (Tr. at 26.) Based on this RFC, the ALJ concluded that plaintiff was precluded from his past work, which the VE classified as medium and light. However, relying on the testimony of the VE and using Grid Rule 201.21 as a framework, she concluded that plaintiff could perform other jobs such as information clerk, office clerk and interviewer. (Tr. at 26-27.) Therefore, she found him not disabled and denied the application. (Tr. at 27-28.)

Plaintiff again sought review by the Appeals Council (Tr. at 11), but on September 18, 2006, the Council denied his request. (Tr. at 8.)

**B.    Medical Evidence**

**1.    Treatment Records**

Plaintiff injured his back at work on November 20, 1997 when he slipped and fell while fueling a truck. Initially diagnosed with a lumbar strain, an MRI later revealed a herniated disc (Tr. at 684-85; 686-87), and plaintiff underwent a laminectomy and L5-S1 discectomy performed by Dr. James Stoll on May 1, 1998 (Tr. at 354-55; 675-77). Due to continued pain and the apparent failure of other treatment modalities (Tr. at 688-89), plaintiff enrolled in a pain management program from July 20, 1998 to August 21, 1998, but made little progress due to poor attendance and marginal effort (Tr. at 351-53; see also Tr. at 690). Dr. John Galbraith,

a psychologist, diagnosed chronic pain syndrome with significant personality factors (somatization, depression, anxiety and likely characterologic features) and suggested anti-depressant medications. (Tr. at 359-60.) Dr. James Lincer likewise diagnosed chronic pain syndrome with depression, anxiety and somatization and recommended anti-depressant medications. (Tr. at 369-70.) On September 25, 1998, Dr. Stoll indicated that plaintiff had reached a healing plateau and assigned a permanent partial disability (ppd) rating of 5%. (Tr. at 691.) On November 30, 1998, Dr. Stoll amended the ppd rating to 10%, but opined that plaintiff was employable in a light to light/medium capacity. He further stated that if plaintiff had been diligent in muscle rehabilitation he would have been back to work long ago. (Tr. at 692-93.)

On February 25, 1999, plaintiff underwent a functional capacity evaluation in connection with his workers' compensation claim, which assessed him to be capable of sedentary work based on lifting ability, with the ability to sit for about twenty-five minutes and stand for fifteen to twenty minutes. (Tr. at 695.) The evaluator recommended work restrictions of occasional lifting of thirty pounds, ten pounds frequently from thigh to shoulder height; allowance of position change from sitting to standing every thirty minutes; avoidance of squatting and ladder climbing, and frequent bending, twisting and kneeling; and limited pushing and pulling. (Tr. at 696.) Nevertheless, the evaluator opined that it may not be feasible for plaintiff to work more than six hour per day even with these restrictions. (Tr. at 696.)

In early 1999, plaintiff was diagnosed with diabetes, for which he received treatment at the Veteran's Administration Medical Center ("VAMC"). (Tr. at 304-49; 389-416.) In November 2000, plaintiff quit taking his insulin in an apparent effort to kill himself. He was hospitalized at the VAMC with hyperglycemia but apparently did not received psychiatric treatment at that

6

time. (Tr. at 547-48) On February 15, 2001, plaintiff again attempted suicide, this time by overdosing on insulin and was again hospitalized at the VAMC. After being medically stabilized, he was transferred to the Psychiatry Unit on February 16, with a diagnosis of depression, NOS, and started on medication. His depression slowly improved, and by February 21 he no longer had suicidal ideation and was discharged in satisfactory condition. (Tr. at 547-50.)

Plaintiff was then placed in the VA's Domiciliary program from February 21, 2001 to May 1, 2002, during which he maintained sobriety and attended aftercare groups. (Tr. at 287; 602.) During this time, he also received education on diabetes management, substance abuse therapy and pain management therapy. (Tr. at 496-507; 509-16; 526-27; 530.) An April 5, 2001, mental health progress note indicated that plaintiff was not impaired in orientation, impulse control, motivation and attention to task; minimally impaired in socialization, expression of feelings, recall/retention, independence/problem solving and anxiety; and moderately impaired in self-esteem, assertion and coping skills. (Tr. at 522-23.) On April 11, 2001, plaintiff saw Dr. William Anderson for a medication check. stating that he was now able to sleep and thought of suicide only occasionally, but still felt depressed with low energy. Dr. Anderson discussed an increase in plaintiff's Wellbutrin dosage. (Tr. at 508.)

On May 3, 2001, plaintiff reported that he had "been feeling great" (Tr. at 490), and an occupational therapy note also indicated that plaintiff had been making progress and presented as "optimistic and motivated in his recovery program." (Tr. at 490-91.) A May 11, 2001 note indicated that plaintiff continued to be sober but lacked insight into dietary limitations due to his diabetes. (Tr. at 481.) Also on May 11, Dr. Anderson noted that plaintiff had little thought of death, his mood was "fairly good" and his attitude was "positive." (Tr. at 482.) Dr. Anderson's

7

impression was that plaintiff's depression was "improved." (Tr. at 482.) In a June 1, 2001 record, plaintiff was noted to be making progress in occupational therapy treatment. (Tr. at 609.) In a June 5, 2001 session, plaintiff reported feeling "pretty good" with mental health treatment. (Tr. at 602.) On June 8, 2001, plaintiff reported that his back had "been feeling great," and he was discharged from physical therapy. (Tr. at 600.) A June 18, 2001 note indicated that plaintiff was not impaired in orientation, socialization, assertion, expression of feelings, impulse control, recall/retention, independence/problem solving, motivation, anxiety and attention to task; and minimally impaired in self-esteem and coping skills. (Tr. at 592-97.)

Plaintiff continued treatment at the VA in the summer of 2001, although his attendance was irregular. (Tr. at 577-78.) In a June 22, 2001, psychological assessment, Jim Bromley, MSW, indicated that plaintiff was not then depressed and believed that plaintiff's previous suicide attempt occurred when he was using drugs and depressed. Mr. Bromley's assessment was that plaintiff was an intelligent person who could be motivated to work on physical and emotional recovery and was doing so. (Tr. at 588-90.) On June 26, 2001, a VA therapist noted plaintiff to be communicative with a pleasant, cooperative affect and an attention span of greater than fifteen minutes. He seemed motivated. (Tr. at 587-88.) Dr. Anderson's July 10, 2001 note indicated that plaintiff was lonely at times but otherwise felt OK on Wellbutrin. Dr. Anderson added Desipramine. (Tr. at 582.)

In August and September 2001, plaintiff underwent pulmonary physical therapy at the VA to address breathing problems. (Tr. at 554-56; 569.) He also continued substance abuse aftercare meetings at the VA in the fall of 2001 (Tr. at 565; 570-72), as well as out-patient psychiatric treatment. In an August 15, 2001 note, Dr. Anderson indicated that plaintiff continued to feel pessimistic with passing suicidal ideation and increased plaintiff's medication

8

dosage. (Tr. at 574.)

Plaintiff also continued group therapy at the VA in the fall of 2001. (Tr. at 703-04; 706-12.) On November 2, 2001, he returned to Dr. Anderson, reporting that his pain and hyperglycemia were getting him down. Dr. Anderson also wondered if plaintiff may be experiencing absence seizures, as he described thirty to sixty second periods where he was not aware of what was happening. Dr. Anderson adjusted his medication. (Tr. at 705.)

Plaintiff continued in group and occupational therapy at the VA in 2002. (Tr. at 719-726.) On January 10, 2002, an occupational therapy capacity evaluation was conducted, which found that plaintiff was capable of light work. (Tr. at 749-53.) A January 10, 2002 treatment plan review indicated that plaintiff had remained sober and attended most aftercare groups. (Tr. at 713-15.) A January 24, 2002 group therapy note indicated that plaintiff appeared to be doing well with a pleasant attitude. (Tr. at 717.) He missed his appointment with Dr. Anderson on January 25, 2002. (Tr. at 718.)

On February 21, 2002, plaintiff underwent a stress test based on his complaints of chest pain, which revealed a below average exercise tolerance, but was otherwise normal. (Tr. at 776-77; 809.) Plaintiff also underwent physical therapy at the VA in early 2002 and received a steroid injection for his back, which did not help for long. (Tr. at 754-71.) A March 7, 2002 therapy note indicated that plaintiff appeared to be content with a happy face. (Tr. at 724.) Plaintiff complained of right elbow pain on March 13, 2002 after lifting weights. (Tr. at 772.) On March 19, 2002, he again reported blackout-type episodes. The doctor indicated that it was unlikely plaintiff had a seizure disorder but considered "sleep apnea and its daytime sequelae." (Tr. at 773.)

On March 21, 2002, plaintiff underwent an EMG related to his complaints of low back

9

pain radiating into his legs.  The doctor's impression was that plaintiff's pain did not "appear related to any significant lumbosacral radiculopathy." (Tr. at 781.) Plaintiff returned on March 26, 2002 complaining of back pain and was given Darvocet.  A new MRI showed no surgical defects and mild degenerative disc disease.  (Tr. at 782.)  Plaintiff reported that Darvocet helped with the pain but caused abdominal problems, so he switched to Tylenol 3.  (Tr. at 785.) Plaintiff also complained of an elbow problem but stopped physical therapy stating that it did not help.  (Tr. at 787.)  He saw Dr. Thomas Naughton, his primary care physician, about right elbow pain on April 19, 2002, and was provided Celebrex.  (Tr. at 797.)  An x-ray was normal. (Tr. at 802; 844.)

During this time, plaintiff also continued with mental health treatment.  He saw Dr. Anderson on March 28, 2002, who continued his medications.  (Tr. at 727.)  During April 3 and 11, 2002 group sessions, plaintiff appeared "content" and was considering returning to school. (Tr. at 728; 729.)  An April 12, 2002 treatment plan review indicated that plaintiff continued in aftercare and had managed to save some money.  He planned on moving into his own apartment in May.  (Tr. at 730.)  The April 18 group note indicated that plaintiff had a "positive attitude."  (Tr. at 732.)  His missed two sessions after he moved on May 1, 2002 but returned to the group on May 15, 2002 and appeared to be content.  (Tr. at 734-36; 800.)  He appeared happy with his new apartment on May 22, 2002.  (Tr. at 737.)  On June 19, 2002, plaintiff discussed his health problems but "appeared to be in good spirit."  (Tr. at 741.)  On July 10, 2002, he "appeared to be in a positive frame of mind and . . . content."  (Tr. at 744.)  He returned to Dr. Anderson on July 12, 2002, and was "feeling OK mood wise."  (Tr. at 745.) Plaintiff discussed pain issues, and Dr. Anderson continued his medications, including Prozac. (Tr. at 745.)  After missing several group sessions, plaintiff was terminated from aftercare on

10

August 14, 2002.  (Tr. at 747.)

Regarding his physical problems during the spring and summer of 2002, plaintiff reported chest pain and tightness on June 3, 2002, but was discharged home after being checked out.  (Tr. at 805; 810.)  He returned to the VA on June 7, 2002, and Dr. Naughton assessed possible somatization disorder/malingering.  (Tr. at 812.)  On July 18, 2002, plaintiff stated that his pain was under reasonable control with his medication regimen.  (Tr. at 816.)  On August 15, 2002, he reported that his breathing had improved since he quit smoking.  (Tr. at 817.)  In September 2002, he was seen regarding lower extremity edema and advised to reduce the salt in his diet and elevate his legs when not active.  (Tr. at 820-21.)  On September 17, 2002, he underwent a sacro-iliac ("SI") joint injection.  (Tr. at 823.)  Plaintiff also saw an occupational therapist at the VA about a weight loss plan and continued with physical therapy at the VA in October and November.  (Tr. at 824-29; 837-38; 1218; 1224-26.)

Plaintiff returned to Dr. Anderson on October 11, 2002, and reported that his cousin was recently murdered.  Dr. Anderson wrote that plaintiff was staying sober and "had a time of depression he seems to come out of and the gabapentin has helped with anxiety."  (Tr. at 748.)  Plaintiff was going to NA meetings and trying to bear with the pain he had.  He was concerned about the addictive potential of his pain medication.  (Tr. at 748.)  In November 2002, plaintiff was seen for a re-check by Dr. Naughton and reported "being in good spirits."  (Tr. at 849.)

However, on December 18, 2002, plaintiff's physical therapist opined that plaintiff "has the start of a serious depression right now and I am concerned about his sudden reversal of being more active and involved in life."  (Tr. at 1211.)  He was instructed on a home exercise program and discharged from PT.  (Tr. at 1211.)  Also on December 18, 2002, plaintiff told Dr. Anderson that he was feeling badly due to pain.  His mood was stable.  Dr. Anderson continued

11

plaintiff on Prozac. (Tr. at 1212.)

On January 30, 2003, plaintiff reported possible "mini-seizures," which he described as "fading in and out." (Tr. at 861.) Plaintiff next saw Dr. Anderson on February 12, 2003, with no "acute mental status findings, [but] blunted affect." (Tr. at 1203.) Dr. Anderson's assessment was that plaintiff was maintaining well but may be binge eating. (Tr. at 1203.) On April 22, 2003, plaintiff reported to Dr. Anderson that he was tolerating the Wellbutrin well, had lost weight and was more energetic. His depression was "very well controlled." Dr. Anderson's impression was that plaintiff's depression was "finally coming in good control." (Tr. at 1186.)

On July 2, 2003, plaintiff returned to Dr. Anderson, who noted plaintiff to be euthymic[5] but concerned about finances. He was "doing OK, but depression could be better." (Tr. at 1165.) On September 5, 2003, plaintiff again saw Dr. Anderson and reported feeling "like he is struck," mainly due to his inability to work. (Tr. at 1155.) Plaintiff reported performing some mechanic work, but the next day his hands were painful. Dr. Anderson advanced plaintiff's Wellbutrin dose to increase energy. (Tr. at 1156.)

On December 3, 2003, plaintiff returned to Dr. Anderson for a med check on depression, and was taking Wellbutrin and Prozac. He reported poor sleep, but more energy with Wellbutrin and no side effects. On mental status exam, plaintiff was fully oriented, euthymic, with no psychosis or agitation. Dr. Anderson's impression was that plaintiff's depression was "reasonably at bay." (Tr. at 1138.) He continued plaintiff's medication and scheduled a re-check for three months. (Tr. at 1138.)

On November 18, 2003, plaintiff received another SI injection for his back. (Tr. at 1144.)

_____

[5]Euthymic refers to "moderation of mood, not manic or depressed." Stedman's Medical Dictionary 678 (28th ed. 2006).

12

However, when he returned for recheck on February 26, 2004, he complained of back pain, stating that the injection from November 2003 did not work at all, not even a single day. (Tr. at 1046.) He was started on Naproxen. (Tr. at 1047.) On April 27, 2004, he reported that his pain was reasonably controlled with his current medications. (Tr. at 1025-26.) A June 17, 2004 depression screen was normal. (Tr. at 1017.)

On August 24, 2004, plaintiff was seen for a re-check of his asthma and started on Flovent. (Tr. at 995.) He was also seen for back pain and told to continue with the whirlpool and TENS unit, with a possible SI joint injection in two months. (Tr. at 998.) On August 30, 2004, plaintiff visited the VA complaining of leg edema and arthritic pain since his Naproxyn was discontinued due to renal concerns. Dr. Naughton continued his other medications. (Tr. at 989-92.) On October 19, 2004, plaintiff underwent another SI joint injection. (Tr. at 975.)

In December 2004 and January 2005, plaintiff participated in a back exercise group at the VA and was noted to tolerate the exercise well. (Tr. at 947-49; 953-54; 959-61.) In January and February 2005, plaintiff complained of shoulder and elbow pain. Dr. Naughton ordered x-rays, which were normal. (Tr. at 1111-17; 1132; 1227; 1228; 1252-53; 1257-58.) He had another SI injection in July 2005. (Tr. at 1057-65.)

Finally, a June 21, 2005 note from Dr. Anderson indicated that he had not seen plaintiff since December 2003, after plaintiff failed to appear for his March 2004 appointment. Dr. Anderson indicated that it was OK with him if plaintiff's primary doctor managed plaintiff's Prozac use, but plaintiff would have to return to the out-patient psych clinic for monitoring if he were to do it. (Tr. at 1082.)

**2.    Treating Source Reports**

Prior to the initial hearing, plaintiff filed two reports from treating physicians in support

13

of his claim. On December 12, 2001, Dr. Anderson completed a mental RFC report in which he indicated that plaintiff suffered from depression and cocaine dependency in remission, with a GAF of 55.[6] He indicated that plaintiff treated with medications and therapy, and had a good response re: substance abuse but moderate results re: depression. He indicated that plaintiff suffered medication side effects including dry mouth, dizziness and lethargy. As clinical findings supporting his diagnosis, he listed poor concentration, flat affect, psychomotor slowing, occasional periods of dissociation, and limited energy and alertness, with a fair prognosis. (Tr. at 679.) Under the B criteria of the Listings, he opined that plaintiff was moderately limited in ADL's and social functioning; markedly impaired in concentration, persistence and pace; with three episodes of decompensation. (Tr. at 682.) He further opined that plaintiff was unable to meet competitive standards in remembering work-like procedures, maintaining attention for a two hour segment and completing a normal workday without interruptions from psychological symptoms; and was seriously limited in understanding and remembering short and simple instructions, maintaining regular attendance, working with others, making simple decisions, performing at a consistent pace, and getting along with others, including co-workers and supervisors. (Tr. at 680.) Finally, he opined that plaintiff would be absent more than four days per month due to his impairments and was not a malingerer. (Tr. at 683.)

On January 30, 2002, Dr. Sahail Masudi completed an RFC report pertaining to plaintiff's diabetes, in which he identified plaintiff's symptoms as fatigue, difficulty walking, swelling, muscle weakness, psychological problems, abdominal pain, extremity pain and

---

[6]GAF ("Global Assessment of Functioning") is an assessment of the person's overall level of functioning. Set up on a 0-100 scale, a score to 50-60 denotes moderate symptoms or moderate impairment in school, occupational or social functioning. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

numbness, frequent urination and headaches. As clinical findings, Dr. Masudi listed abdominal obesity, bilateral leg swelling and decreased sensation in both feet. He indicated that plaintiff was not a malinger, but emotional factors did affect his physical condition. (Tr. at 669.) He indicated that plaintiff would occasionally (6-33% of the day) experience pain or other symptoms severe enough to interfere with attention and concentration. (Tr. at 670.) He opined that plaintiff could walk four to five blocks, sit and stand one hour at a time and two hours total during an eight hour day, with the ability to shift positions at will. (Tr. at 670-71.) He further indicated that plaintiff would have to elevate his legs during prolonged sitting. He stated that plaintiff could lift ten pounds frequently, twenty pounds occasionally; occasionally twist and climb stairs; but rarely stoop, crouch or climb ladders. He said that plaintiff had significant limitations in handling and fingering, had to avoid environmental irritants and would likely be absent more than four days per month due to his impairments. He further stated that plaintiff had some blurred vision and decreased sensation in the hands and feet. (Tr. at 671-72.)

### 3. SSA Consultants

The SSA also solicited reports from several consultants in connection with plaintiff's claim. On July 30, 1999, Dr. David Evanich examined plaintiff, who complained of bilateral wrist pain, right greater than left. Plaintiff reported wrist fractures during a basketball game in 1984. (Tr. at 417; see also Tr. at 610.) He also complained of low back pain and bilateral ankle pain. (Tr. at 417-18.) On examination, plaintiff was noted to have normal gait but could not heel or toe talk. He had some mild tenderness to palpation at L3-4 with some spasm on the right. (Tr. at 418.) He also had some swelling of the ankles, with tenderness to palpation. (Tr. at 419.) He was able to use his hands without difficulty, though his grip strength was slightly reduced secondary to wrist pain. Regarding his wrist pain, Dr. Evanich opined that

15

plaintiff may have a TFC tear or tendinitis of the wrists. Regarding his back, the doctor opined that plaintiff's symptoms were suggestive of a recurrent herniated disc. (Tr. at 420.) Regarding plaintiff's ankles, Dr. Evanich saw no evidence of osteoarthritis. Plaintiff's mild swelling would improve with anti-inflammatory medication and did not appear to be functionally limiting. (Tr. at 421.)    On August 6, 1999, Dr. Kenneth Bussan prepared a physical RFC assessment for the SSA, finding that plaintiff could lift twenty pounds occasionally, ten pounds frequently; stand and/or walk six hours in an eight hour day; sit about six hours in an eight hour day; and push/pull in unlimited fashion. (Tr. at 423.) He found no postural, manipulative, visual, communicative or environmental limitations. (Tr. at 424-46.) Dr. Chan reviewed and approved the assessment on January 24, 2000. (Tr. at 429.)

On January 10, 2000, Dr. Jeffrey Polczinski completed a psychological consultative exam. Dr. Polzcinski stated that plaintiff had a history of back pain but had taken a passive approach to it and had been generally non-compliant with treatment. He further opined that plaintiff "does appear to have some low grade depression that has been evident for quite some time and likely is strongly influenced by his lifestyle." (Tr. at 436.) In assessing plaintiff's abilities, he concluded that plaintiff "does appear to have the cognitive capacity to understand at least simple directions presented to him. His memory is intact. It is believed that his attention and concentration abilities are also intact." (Tr. at 436.) He diagnosed plaintiff with depressive disorder and somatization disorder, with a GAF of 52. (Tr. at 436-37.) On January 18, 2000, an SSA reviewer (whose signature is illegible) completed a psychiatric review technique form for the SSA in which he concluded that plaintiff had no severe mental impairment. (Tr. at 438-45.)

On June 30, 2001, plaintiff was seen for an evaluation by Dr. Neil Johnson. Plaintiff

16

reported hypertension, shortness of breath and diabetes. He also stated that he was depressed because of all the medications he had to take and reported suicide attempts in November 2000 and February 2001. He further stated that he was frustrated by his inability to remain active. Plaintiff reported being able to lift twenty pounds, walk 1/4 block, stand five minutes and sit for thirty minutes. He stated that he could go up stairs but not a ladder. (Tr. at 610-11.) On examination, Dr. Johnson found plaintiff to have limited range of motion of the left wrist, with reduced pinch and grip strength, and limited flexion and extension of the lumbar spine. (Tr. at 612-13.)

On August 13, 2001, an SSA reviewer completed a physical RFC assessment, concluding that plaintiff retained the RFC for light work, with only occasional stooping or crouching, limited handling, and avoidance of environmental irritants. (Tr. at 625-32.)

On August 14, 2001, Dr. Roger Rattan completed a psychiatric review technique form for the SSA, indicating that plaintiff had no severe mental impairment. (Tr. at 633.) Dr. Rattan noted plaintiff's history of depression but stated that it was improved with treatment. (Tr. at 636.) Under the B criteria, he rated plaintiff as mildly limited in ADL's and maintaining social functioning, and not limited in concentration, persistence or pace, with no episodes of decompensation. (Tr. at 643.)

On November 8, 2001, Dr. John McDermott completed a physical RFC assessment for the SSA, opining that plaintiff could perform medium work, with occasional stooping, kneeling, crouching and crawling. (Tr. at 647-54.)

Finally, on November 9, 2001, Dr. Arden Mallberg completed a psychiatric review technique form for the SSA, indicating that plaintiff had no severe mental impairment. (Tr. at 655.) Under the B criteria, he rated plaintiff as mildly limited in ADL's and maintaining social

functioning, not limited in concentration, persistence or pace, with one or two episodes of decompensation. (Tr. at 665.) Dr. Mallberg also noted plaintiff's history of depression but wrote that he "does not have restrictions at this time." (Tr. at 667.)

## C.   Hearing Testimony

### 1.   December 6, 2002 Hearing

Plaintiff testified that his date of birth was April 25, 1954, he was right-handed, 5'11' tall, 312 pounds and lived by himself. (Tr. at 1292-93.) He stated that he last worked in November 1997 as a delivery driver and that he stopped working after he fell off of a piece of equipment and injured his back. (Tr. at 1294.) Plaintiff testified that he received mental health treatment, including medication, at the VA. (Tr. at 1295-96.) He stated that he saw Dr. Anderson for depression and that he had tried to commit suicide a couple of times, but that his depression was a little better on medication. He said that he still got depressed, where he did not want to leave the house, every couple of weeks. (Tr. at 1311-12.) He further stated that he also had poor concentration and could not read a book or follow a TV program. (Tr. at 1313.)

Plaintiff testified that he had constant pain in his lower back, for which he took medication, used a TENS unit and laid on his back with a pillow between his legs. (Tr. at 1296.) He also testified that he had pain in his right shoulder, off and on, for which he also took medication. He further testified that he felt pain in his wrists, particularly with changes in weather, and in his knees, after walking or sitting with bent legs. (Tr. at 1297.) He testified that his medications had side effects of dry mouth, wooziness and drowsiness. (Tr. at 1299.)

Plaintiff stated that on a typical day he woke up, took his pills, straightened up around the house, then went to doctor's appointments or NA meetings. He said that his house work

18

was limited to making the bed and doing some dishes; his daughter-in-law did the cleaning. (Tr. at 1299-1300.) He did his own cooking but no laundry or yard work. He stated that he went to physical therapy once every three weeks and to church weekly. (Tr. at 1300.) He stated that he did only small shopping trips and had no hobbies or community activities. He stated that he no longer drank or used illegal drugs. (Tr. at 1301-02.)

Plaintiff testified that he could walk a couple of blocks, stand for fifteen minutes and sit for thirty minutes, and lift about ten pounds. He said that he had difficulty with stairs, and that he could use his hands "but sometimes it bothers me some." (Tr. at 1303.) He clarified that he had bad wrists, which sometimes made it hard to squeeze things and that this sometimes depended on the weather. (Tr. at 1304.) His wrist problem was based on an old injury; he indicated that he had no recent injuries or treatment for his wrists. (Tr. at 1305.)

Plaintiff testified that he was also diagnosed with diabetes and suffered numbness in his feet as a result, which required him to elevate his legs. (Tr. at 1307.) He stated that he also took a diuretic to keep the swelling in his ankles down and that his ankles swelled a couple times per week, which required him to get off his feet for about one-half hour. (Tr. at 1308.) He also stated that he experienced shortness of breath due to asthma and bronchitis. (Tr. at 1309.)

Plaintiff testified that he did not think he could do full-time, sit-down work because normally after sitting or standing for a length of time he had to lie down for one-half to one hour due to back pain. Plaintiff also testified that he had to get up to urinate about every hour. (Tr. at 1310; 1314-15.) Plaintiff acknowledged that a recent VA functional capacity evaluation concluded that he could perform light work, but he testified that he could not stand a majority of the day and could not constantly lift ten pounds due to arthritis in his hands and wrists and

19

back pain. (Tr. at 1316-17.) The ALJ asked plaintiff about notations in the record pertaining to his exercise program at the YMCA, but he denied exercising on a regular basis or using the weight equipment. (Tr. at 1322-24.)

Plaintiff's mother testified that plaintiff was able to cook, make his bed and do minor cleaning, and watched TV. (Tr. at 1327.) She said that he did little outside of the home, whereas he used to bowl and engage in other activities. (Tr. at 1328.) She stated that he had trouble sitting for extended periods and had to get up and move around, and that he was unable to walk long distances. (Tr. at 1329.) She testified that his mental health had improved with treatment, but he still had trouble at times being around a lot of people. (Tr. at 1330.) She also stated that he had to lie down at times and could not sit six out of eight hours. (Tr. at 1331-32.) She testified that he sometimes went to the YMCA and walked on the treadmill, or let his grandchildren swim. (Tr. at 1333.)

The vocation expert, Timothy Riley, classified plaintiff's past work as follows: truck driver – medium, semi-skilled work; school bus driver – light, semi-skilled; and shipping clerk – medium, semi-skilled. (Tr. at 1334-35.) The ALJ then posed a series of hypothetical questions, assuming a person forty-eight years old, with a GED and work history like plaintiff's. The first question involved an individual capable of medium work, with occasional postural activity. The VE testified that such a person could perform all of plaintiff's past jobs. The second question involved an individual capable of light work, and the VE eliminated the shipping clerk and truck driver positions, leaving the bus driver job. (Tr. at 1335.) The third question added a restriction of no exposure to irritants, which eliminated the bus driver job. (Tr. at 1335-36.) However, the VE stated that such a person could perform other jobs, including counter clerk (12,000 light and 200 sedentary), cashier (5000 light and 4000

sedentary), retail sales clerk (6000 light and none sedentary), cleaner (1000 light, none sedentary), messenger (900 light, none sedentary), and general office clerk (2000 light, 1000 sedentary). (Tr. at 1336-37.) If the individual needed to be able to alternate positions from seated to standing as needed, the retail sales clerk, cleaner and messenger positions could not be performed, but the counter clerk, cashier and office clerk jobs could still be done. (Tr. at 1337-38.) If the person could not reach over head, the answer was the same. The VE further stated that these were all simple jobs, with SVPs of one or two.[7] If the ALJ added a restriction of no repetitive use of the hands, none of the identified jobs could be performed. (Tr. at 1338.)

### 2. August 11, 2005 Hearing

At the new hearing after remand, plaintiff testified that he started having problems with his hands in 1997, which became worse in 1999. He stated that at times he did not have the strength to squeeze hard enough to pick things up. He said that he could probably perform grasping activities for about an hour but could not do so for six out of eight hours. (Tr. at 1347-48.) He also said that he could not engage in fingering for six hours out of eight. (Tr. at 1349.) He said that he could fasten the buttons on a shirt but mostly wore pullovers. He also said that he kept his shoes ties and just slipped them on. He testified that he carried only small grocery bags and used two hands to pore a gallon of milk. (Tr. at 1351.) He said that he had trouble sitting for long periods and had to get up and move around. (Tr. at 1352.) He also testified that his ankles hurt and his legs swelled a couple times per week, and that he had to elevate his

---

[7]"'SVP' stands for 'Special Vocational Preparation.' An SVP of one means that the job can be learned with just a short demonstration. An SVP of two means that the job may require anything beyond a short demonstration up to 30 days of training to learn." Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1021 n.3 (E.D. Wis. 2004).

21

legs when they swelled. (Tr. at 1353-54.) On questioning by the ALJ, he admitted that he lifted weights at the YMCA in 2001 but stated that they were small hand weights of about three pounds. He said that he stopped exercising in 2001. (Tr. at 1355-56.)

The VE, Robert Neuman, testified that plaintiff's past jobs were classified as indicated by the VE in the previous hearing, except that plaintiff's truck driver job appeared to be heavy work as plaintiff performed it. (Tr. at 1356-57.) He also stated that school bus driver was medium work, according to the Dictionary of Occupational Titles ("DOT"), but sedentary as plaintiff performed it. (Tr. at 1357-58.) Finally, the VE added a forklift driver job to the list of plaintiff's previous occupations, which he described as medium and semi-skilled in general, but heavy as plaintiff performed the job. (Tr. at 1357.) Plaintiff had no transferable skills based on his past work. (Tr. at 1358.)

The ALJ then asked a series of hypothetical questions assuming a person fifty-one years old, with a GED and vocational history as described. The first question assumed a person capable of medium work limited to only occasional postural movements. According to the DOT, all of plaintiff's past jobs could be performed. (Tr. at 1358.) The ALJ then added a restriction of no overhead reaching, which would affect the forklift driver job and possibly the truck driver job, but not the bus driver position. (Tr. at 1358.) If the person were limited to light work, he could still perform the bus driver job as plaintiff performed it. (Tr. at 1359.) If the person could perform only unskilled, simple, routine, repetitive work, the bus driver job could not be performed, according to the DOT. (Tr. at 1359.) However, such a person could perform other jobs, including production inspector (3800 light, 370 sedentary), office clerk (3300 light, 1200 sedentary), shipping clerk (2000 light), information clerk (2100 sedentary) and interviewer (700 sedentary). (Tr. at 1359-60.) If the person needed a sit-stand option or could not be

22

exposed to irritants, these jobs would not be affected.[8]  (Tr. at 1360; 1361.)  Likewise, if the person could use his hands frequently but not constantly, the person's ability to do the jobs would not be affected.  However, if the person could use his hands only occasionally, the identified jobs could not be performed.  (Tr. at 1360.)  The VE could not identify any other full-time positions that could be performed with such restrictions.  (Tr. at 1360-61.)

## III.  DISCUSSION

Plaintiff argues that in denying his claim the ALJ (1) erred in finding his mental impairments not severe; (2) improperly rejected the treating source reports of Drs. Anderson and Masudi; (3) failed to consider whether he met a Listing; and (4) improperly evaluated the credibility of his testimony.

### A.    Severity of Mental Impairments

The ALJ concluded that plaintiff's mental impairments were not severe.  She noted that she had also found plaintiff's mental impairments non-severe in her previous decision, a finding plaintiff did not question before the Appeals Council.  She further noted that the primary focus at both hearings was on plaintiff's physical problems, and that the VA records submitted for the supplemental hearing made few references to mental problems.  Most of those entries indicated that plaintiff as "doing well" or "doing OK."  (Tr. at 22.)  Plaintiff argues that the ALJ erred in making this finding.

Under SSA regulations, an impairment is severe if it significantly limits the claimant's "physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c) & 1521(a).  Basic work activities mean the abilities and aptitudes necessary to do most jobs.  Examples

---

[8]However, if the person needed to stand four or five times, in addition to three scheduled breaks, it would present a problem with sedentary work.  (Tr. at 1366.)

23

include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

> (2) Capacities for seeing, hearing, and speaking;

> (3) Understanding, carrying out, and remembering simple instructions;

> (4) Use of judgment;

> (5) Responding appropriately to supervision, co-workers and usual work situations; and

> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b).

An impairment is not severe if the "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85-28. An impairment must be established by medical evidence consisting of signs, symptoms and laboratory findings, not only by the claimant's statement of symptoms. 20 C.F.R. § 404.1508; see also SSR 85-28 (stating that the determination of whether an impairment is severe is made based on medical considerations alone).

SSA regulations prescribe a "special technique" for evaluating mental impairments. 20 C.F.R. 404.1520a(a). Under this technique, the ALJ must first evaluate the claimant's pertinent symptoms, signs and laboratory findings to determine whether he has a medically determinable mental impairment. § 404.1520a(b)(1). If so, the ALJ must then rate the degree of functional limitation resulting from the impairment(s). § 404.1520a(b)(2). As noted above, there are four broad functional areas in which the ALJ rates the degree of functional limitation: ADL's; social functioning; concentration, persistence or pace; and episodes of decompensation. §

24

404.1520a(c)(3). The ALJ rates the degree of limitation in the first three functional areas using a five-point scale: none, mild, moderate, marked and extreme. The degree of limitation in the fourth functional area (episodes of decompensation) is evaluated using a four-point scale: none, one or two, three, four or more. If the ALJ rates the degree of limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, she generally may conclude that the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities. § 404.1520a(d)(1). If the mental impairment is severe, the ALJ will then determine if it meets or is equivalent in severity to a listed mental disorder. § 404.1520a(d)(2). The ALJ must document application of this technique and must include a specific finding as to the degree of limitation in each of the functional areas in the decision. § 404.1520a(e)(2).

In reviewing an ALJ's decision finding an impairment not severe, the court must keep in mind that the step two requirement that the claimant have a severe impairment is generally considered to be "a de minimis screening device to dispose of groundless claims." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing Bowen v. Yuckert, 482 U.S. 137, 153-54 (1987) (O'Connor, J., concurring)). Thus, reasonable doubts as to severity should be resolved in favor of the claimant. Samuel v. Barnhart, 295 F. Supp. 2d 926, 952 (E.D. Wis. 2003). However, if the ALJ found other severe impairments, continued on with the sequential evaluation process and properly considered all of the claimant's impairments, severe and non-severe, in setting RFC, any error in finding a particular impairment non-severe at step two may be harmless. Masch, 406 F. Supp. 2d at 1054.

In the present case, as plaintiff notes, the record contains significant evidence of a severe mental impairment, including the report of examining consultant Dr. Polczinski, who

25

diagnosed depression with a GAF of 52; the on-going treatment with Dr. Anderson and the VA therapists; plaintiff's placement in the VA domiciliary program for over a year; and his two suicide attempts. However, standing against this evidence are the reports of the two SSA consultants who found no severe mental impairment. Specifically, Dr. Rattan acknowledged plaintiff's history of depression but noted that it was currently improved with treatment. (Tr. at 636.) Similarly, Dr. Mallberg concluded that plaintiff's depression was improved with treatment and that he had no current restrictions. (Tr. at 667.) As the ALJ noted, the treatment records lent support to the consultants' opinions. Plaintiff was generally noted to be doing well without significant problems. (Tr. at 22.) Weighing conflicting evidence is a job for the ALJ, not the court, and while I may have come to a different conclusion, the ALJ's decision on this point was not unreasonable. See Young, 362 F.3d at 1101 ("Weighing conflicting evidence from medical experts, however, is exactly what the ALJ is required to do."); see also Arnold v. Barnhart, 473 F.3d 816, 823-24 (7th Cir. 2007) (holding that ALJ could properly reject report in conflict with more convincing opinions of other medical experts).

In any event, even if the ALJ did err in finding plaintiff's mental impairments non-severe, she did not stop at step two. Finding other severe impairments, she continued with the evaluation process and restricted plaintiff to simple, unskilled, routine, repetitive work.[9] (Tr. at 26; 1359.) Aside from Dr. Anderson's report,[10] plaintiff fails to identify any evidence of greater restrictions, particularly in his ability to understand, remember and carry out simple instructions; make simple work-related decisions; respond appropriately to supervision, co-workers and

---

[9]I will discuss step three and the Listings later in this decision.

[10]I address Dr. Anderson's report in the next section of this decision.

26

usual work situations; and deal with changes in a routine work setting – the mental activities required by competitive, remunerative, unskilled work. SSR 96-9p. Therefore, any step two error was harmless.[11]

Plaintiff argues that since the ALJ found no severe mental impairment, there was no basis for her restriction to unskilled, simple, routine work. Not necessarily. In setting RFC, the ALJ must consider the combined effect of all impairments, severe and non-severe. See SSR 96-8p. Plaintiff also argues that the Commissioner cannot create a path of reasoning for the ALJ, and that the matter must be remanded to allow the ALJ to explain the basis for her conclusion. However, "[n]o principle of administrative law or common sense requires [the court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989); see also Sanchez v. Barnhart, 467 F.3d 1081, 1082-83 (7th Cir. 2006) (stating that "in administrative as in judicial proceedings, errors if harmless do not require (or indeed permit) the reviewing court to upset the agency's decision"). Therefore, plaintiff's first assignment of error fails.

## B.    Treating Source Reports

The ALJ rejected the reports of Dr. Anderson, who opined that plaintiff satisfied the

---

[11]Plaintiff also contends that the ALJ erred in not documenting her application of the special technique for evaluation of mental impairments. However, once the ALJ found the impairment non-severe, adopting the reports of the consultants (who did follow the special technique, see David v. Barnhart, 446 F. Supp. 2d 860, 877 (N.D. Ill. 2006) (holding that ALJ's reference to consultant's report satisfied the special technique)), there was no reason for her to continue with that evaluation. Cf. White v. Barnhart, 415 F.3d 654, 658 (7th Cir. 2005) (holding that ALJ did not err in failing to address Listing at step three where she reasonably found mental impairment not severe at step two). Further, for the reasons stated, any error in specifically documenting the technique after step two was harmless.

27

criteria of Listing 12.04, Affective Disorders (Tr. at 682),[12] and Dr. Masudi, who opined that plaintiff could not handle even sedentary work.[13] She noted that despite the severe restrictions contained in his report, Dr. Anderson saw plaintiff infrequently, primarily for medication refills, and that Anderson's treatment notes generally indicated that plaintiff was doing well. (Tr. at 22.) She further noted that Dr. Masudi's report conflicted with a functional capacity evaluation ("FCE") done at the VA around the same time (January 2002), and that plaintiff had not seen Dr. Masudi in the past year. (Tr. at 23.) Finally, she stated that the "fill in the blank" forms from these two doctors were inconsistent with their own contemporaneous treatment notes and the medical evidence in general. (Tr. at 23.) Plaintiff contends that the ALJ erred in rejecting these two reports.

Treating source opinions are given special consideration in social security cases. Dominguese v. Massanari, 172 F. Supp. 2d 1087, 1100 (E.D. Wis.2001). If well-supported by medically acceptable clinical and laboratory diagnostic techniques and "not inconsistent" with other substantial evidence, the ALJ must afford such opinions controlling weight. Id. (citing SSR 96-8p.) Even if the ALJ finds that the opinion is not entitled to controlling weight, she may not simply reject it. SSR 96-2p. Rather, she must evaluate the opinion's weight by looking at the length, nature and extent of the claimant's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the

---

[12]Dr. Anderson further opined that plaintiff could not meet competitive standards in remembering work-like procedures, maintaining attention for a two hour segment and completing a workday without interruptions from psychological symptoms. (Tr. at 680.)

[13]Specifically, Dr. Masudi opined that plaintiff could sit for a total of just two hours in an eight hour day (Tr. at 670), had significant limitations in repetitive reaching, handling and fingering (Tr. at 671), and would be absent more than four days per month based on his impairments (Tr. at 672).

28

record as a whole; whether the doctor is a specialist; and "other factors."  20 C.F.R. § 404.1527(d).  "Regardless of the weight the ALJ ultimately gives the treating source opinion, she must always 'give good reasons' for her decision."  Wates v. Barnhart, 274 F. Supp. 2d 1024, 1034 (E.D. Wis. 2003) (quoting 20 C.F.R. § 404.1527(d)(2)).

Although the ALJ could have been more thorough in her analysis, I cannot conclude that she erred in rejecting Dr. Anderson's report.  The ALJ considered the (in)frequency of plaintiff's contacts with Dr. Anderson, the nature of the treatment (primarily medication management), the comments contained in Dr. Anderson's contemporaneous treatment notes, and the consistency of Dr. Anderson's report with the evidence as a whole, all proper factors under 20 C.F.R. § 404.1527(d).  The ALJ's conclusion that the severe restrictions contained in Dr. Anderson's report were inconsistent with the evidence was reasonable.  In particular, the records from the relevant time period (2000-2002), indicate that plaintiff's depression improved with treatment.  (Tr. at 482; 549.)  In April 2001, plaintiff was noted to be minimally impaired in recall/retention and independence/problem solving, and not impaired in attention to task (Tr. at 522-23); by June 2001, he was not impaired in any of these categories (Tr. at 592-97), which essentially describe the abilities necessary for unskilled work.  His mood was alternately described as "OK" (Tr. at 582; 745), "content" (Tr. at 729), "fairly good" (Tr. at 482), "pretty good" (Tr. at 602) or "in good spirit" (Tr. at 741), and his attitude as "positive" (Tr. at 482; 732; 744).  On June 22, 2001, his therapist indicated that plaintiff was not then depressed and that his previous suicide attempt occurred when he was using drugs.  (Tr. at 588-90.)  It is true that plaintiff was described as down or depressed on other occasions (Tr. at 748; 1211; 1212), but I cannot conclude that the evidence was such that the ALJ could not reasonably conclude that

29

Dr. Anderson's report was inconsistent with the record as a whole.[14]  Plaintiff complains that the ALJ did not mention certain findings contained in Dr. Anderson's report. However, the ALJ need not evaluate in writing every piece of testimony and evidence submitted.   Rather, she need only sufficiently articulate her assessment of the evidence to assure the court that she considered the important evidence and to enable the court to trace the path of the her reasoning.  Books v. Chater, 91 F.3d 972, 980 (7th Cir. 1996).  She met that standard here.

Likewise, I cannot conclude that the ALJ erred in rejecting Dr. Masudi's report.  The ALJ noted that the report was inconsistent with the contemporaneous FCE performed at the VA, which found plaintiff capable of light work (Tr. at 21; 23); that plaintiff had not seen Dr. Masudi within about a year of the first hearing (Tr. at 23)[15]; that plaintiff's grip strength and dexterity were not on testing revealed to be significantly impaired (Tr. at 23); that plaintiff was able to work for years after the 1984 wrist injury to which he traced his hand problems, and the evidence suggested no sudden deterioration or exacerbation (Tr. at 23-24); that EMG and nerve conduction studies performed in March 2002 revealed no significant abnormality (Tr. at

_____

[14]I note that the post-insured status evidence was much the same: plaintiff was noted to be "maintaining well" (Tr. at 1203); his depression was "very well controlled" (Tr. at 1186); he was "doing OK, but [his] depression could be better" (Tr. at 1165); and his depression was "reasonably at bay" (Tr. at 1138).  A June 17, 2004 depression screen was normal.  (Tr. at 1017.) However, on another occasion, plaintiff reported feeling "stuck." (Tr. at 1155.) On June 21, 2005, Dr. Anderson reported that plaintiff failed to appear for his March 2004 appointment, and he had not seen plaintiff since December 2003.  He suggested that plaintiff's primary care physician could take over management of plaintiff's medication.  (Tr. at 1082.)

[15]In her second decision, the ALJ wrote that plaintiff testified that he had not seen Dr. Masudi in the past year.  I found no such testimony.  However, the medical records reveal that the ALJ's point was essentially correct: plaintiff last saw Dr. Masudi on January 30, 2002 (Tr. at 855-56), nearly a year prior to the first hearing, held on December 6, 2002 (Tr. at 1289).  In her initial decision, the ALJ correctly stated that plaintiff had not seen Mr. Masudi for approximately a year, without attributing that fact to plaintiff's testimony.  (Tr. at 69.)

30

24); and that plaintiff was able to engage in activities such as weightlifting and other exercise, social interaction and cross-country travel (Tr. at 24; 69). These are all relevant factors and could reasonably lead the ALJ to conclude that Dr. Masudi's severe restrictions were inconsistent with the other evidence of record.

Plaintiff complains that the ALJ adopted the January 2002 FCE over Dr. Masudi's report without applying the factors set forth in SSR 06-3p. That Ruling provides that an ALJ may give more weight to the opinion of a therapist or "other medical source" than to a treating source, but she must explain the reasons for doing so in her decision. SSR 06-3p. The Ruling also sets forth a list of factors for the ALJ to consider in evaluating "other source" evidence.

The ALJ did not in the present case adopt the FCE report of the therapist over Dr. Masudi's report; rather, she cited plaintiff's abilities as found in the FCE as inconsistent evidence in evaluating Dr. Masudi's opinion that plaintiff was significantly limited. Further, the ALJ did not adopt the light RFC recommended by the FCE; rather, she considered the entire record in concluding that plaintiff was limited to a subset of sedentary work, a finding partially consistent with Dr. Masudi's report. In so doing, the ALJ covered most of the pertinent factors for weighing opinion evidence.

Plaintiff also contends that because no doctor stated that the FCE report was inconsistent with Dr. Masudi's report, the ALJ's contrary conclusion amounted to her "playing doctor." However, while ALJs may not make their own medical findings, they may weigh the evidence and in so doing reject the opinion of a treating source inconsistent with other substantial evidence in the record. See Skarbek v. Barnhart, 390 F.3d 500, 503-04 (7th Cir.

31

2004); see also Hofslien v. Barnhart, 439 F.3d 375, 377 (7th Cir. 2006).[16]

Plaintiff further contends that the ALJ's statement that Dr. Masudi's report was inconsistent with the evidence "in general" was contrary to the treating source rule, which requires the ALJ to search the record for inconsistent evidence in order to give the opinion less than controlling weight. See Dominguese, 172 F. Supp. 2d at 1100. However, the ALJ did cite inconsistent evidence in the present case, including the January 2002 FCE, the March 2002 EMG, and plaintiff's daily activities and ability to work for years following his 1984 wrist injury. Therefore, I find no reversible error in the ALJ's evaluation of Dr. Masudi's report.

## C. Listings

The ALJ concluded, in a terse statement, that none of plaintiff's severe impairments met or equaled a Listing. (Tr. at 25.) Plaintiff argues that the ALJ erred in failing to more fully discuss the Listings and, more specifically, whether he met Listing 12.04.

The claimant bears the burden of demonstrating that his impairments meet a Listing, which requires him to show that his impairments satisfy all of the various criteria specified in the Listing. Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006) (citing Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999)). In the present case, plaintiff relies solely on Dr. Anderson's report to argue that he met Listing 12.04. However, as discussed above, the ALJ reasonably rejected Dr. Anderson's report. With no other evidence that he met a Listing, I cannot find reversible error, even if the ALJ's analysis at step three was "perfunctory." See Barrett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004). Further, as indicated above, the ALJ is not

---

[16]Plaintiff makes reference to the 1999 FCE, which found that he could perform sedentary work, but that it might not be feasible for him to work on a full-time basis. However, this evaluation fell outside the relevant time period and thus is of limited value.

required to discuss a Listing if she reasonably finds the impairment at issue non-severe.  See White, 415 F.3d at 658.

## D.    Credibility

Finally, the ALJ found that plaintiff's testimony as to his limitations was "not totally credible for the reasons set forth in the body of this decision."  (Tr. at 27.)  Plaintiff contends that the ALJ failed to sufficiently explain her credibility determination and ignored evidence supportive of his claims.

Generally, the court must defer to the ALJ's credibility determination because she had the opportunity to personally observe the claimant's demeanor at the hearing.  Windus, 345 F. Supp. 2d at 945.  Thus, the court will ordinarily reverse an ALJ's credibility determination only if it is "patently wrong."  Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003).  "However, when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision." Herron v. Shalala, 19 F.3d 329, 335 (7th Cir. 1994).  Further, the ALJ must comply with SSR 96-7p in evaluating credibility.  Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003).  That Ruling directs the ALJ to evaluate the credibility of the claimant's assertions in light of the medical evidence; the claimant's daily activities; the location, duration, frequency and intensity of the claimant's pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of the claimant's medication; treatment other than medication; any measures the claimant has used to relieve the pain or other symptoms; and functional limitations and restrictions.  SSR 96-7p; 20 C.F.R. § 404.1529(c)(3).  While SSR 96-7p does not require the ALJ to analyze and elaborate on each of these factors when making a credibility determination, the ALJ must sufficiently articulate her assessment of the evidence to assure the court that she

33

considered the important evidence and to enable the court to trace the path of her reasoning. Windus, 345 F. Supp. 2d at 946.

In the present case, the ALJ provided several reasons for finding plaintiff not totally credible. In her original decision, she noted that plaintiff's description of his limited daily activities conflicted with the reports in the VA records, which indicated that he walked thirty minutes per day without problems, and went to the YMCA three to four times per week to use the treadmill and pool and lift weights. In the second decision, she further noted that plaintiff's primary treating doctor at the VA suggested on several occasions that plaintiff was malingering. The newer records further indicated that he was able to fix his car and exercise and lift weights. The ALJ also noted that the objective medical evidence supporting plaintiff's complaints of disabling pain and limitations was "not all that impressive." (Tr. at 26.) Finally, she noted that plaintiff's doctor was unwilling to prescribe narcotics, perhaps because of his history of substance abuse or because his pain complaints were not sufficiently severe.[17] (Tr. at 26.)

Although the ALJ's analysis again could have been more thorough, she touched on several of the relevant factors and reached a reasonable conclusion. In particular, it was

---

[17]Earlier in her decision, the ALJ also detailed plaintiff's limited employment history, which cast some doubt on his motivation to work. (Tr. at 20.) It is true that an ALJ must consider this factor with caution. It may be that a claimant's poor work history is due to his inability to maintain employment in the competitive work market, rather than indolence. However, where the claimant alleges that a traumatic event caused his disability, rather than an ongoing or genetic process, the claimant's poor, pre-injury work history will have more significance. Compare Sarchet v. Chater, 78 F.3d 305, 308 (7th Cir. 1996) (rejecting ALJ's reliance on poor work history where the claimant was "unemployable and has been for a long time"), with Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) (affirming adverse credibility determination based on the claimant's poor work history even before alleged disability onset). In the present case, as the ALJ noted, plaintiff's most productive years occurred in the three years just prior to his alleged disability onset date (1995-1997). (Tr. at 20.) SSA records reveal that plaintiff earned less than $10,000 annually in every year from 1970 to 1994 save one (1986), and earned nothing at all 1991 and 1992. (Tr. at 139; 148; 154; 173.)

34

reasonable for the ALJ to find plaintiff less than fully credible given the contradiction between his denials that he regularly exercised or lifted weights (Tr. at 1322-24; 1355-56) and the medical records, which indicated that he did so (Tr. at 772). At the original hearing, plaintiff denied lifting weights at all (Tr. at 1322-24); at the second hearing, he admitted that he lifted weights at the YMCA in 2001 but claimed they were small hand weights of three pounds (Tr. at 1355-56); but the VA records indicate that he did wrist curls, forearm curls, shoulder presses and bench presses in 2002 (Tr. at 772). Further, the ALJ did not conclude that plaintiff had no disabling symptoms; instead, she concluded that they were not as disabling as he claimed. (Tr. at 26.) She then adopted a fairly restrictive RFC, limiting plaintiff to a sub-set of sedentary work. (Tr. at 26.) The ALJ adequately explained why she found incredible plaintiff's claims of even greater restrictions.

Plaintiff contends that the ALJ failed to recognize that he suffered from a somatoform disorder, a condition characterized by physical symptoms with no demonstrable physical cause. See Carradine v. Barnhart, 360 F.3d 751, 754 (7th Cir. 2004). Thus, he argues that the gap between the objective medical evidence and his claims of disabling pain is not necessarily the product of deception. However, as the ALJ noted (Tr. at 26), Dr. Naughton, plaintiff's primary care physician, offered somatization as a "possible" diagnosis, along with malingering (E.g., Tr. at 812). In any event, an ALJ is not required to accept at face value the limitations claimed by a claimant diagnosed with this condition. See Sims v. Barnhart, 442 F.3d 536, 537-38 (7th Cir. 2006) (stating that credibility is crucial in somatoform cases, and that an ALJ's finding should rarely be disturbed). In the present case, the ALJ accepted that plaintiff experienced pain and had significant physical limitations. However, primarily in consideration of the gap between his demonstrated activities and his testimony, the ALJ found plaintiff not fully credible to the extent

35

that he claimed an inability to engage in any gainful employment. While a somatoform disorder might explain the gap between plaintiff's claims and the objective medical evidence, it cannot explain the gap between his testimony and his ADLs found by the ALJ.

Plaintiff complains that the ALJ speculated about the reason his doctor refused to provide narcotics. Had this been the only reason offered by the ALJ, her decision would be vulnerable, but given the other reasons provided, there was no reversible error. Plaintiff further complains that the ALJ did not clarify what was involved in his weight lifting. Plaintiff testified that he used small, three pounds hand weights, which he just picked up and held (Tr. at 1355-56), testimony the ALJ failed to appreciate. However, as noted above, the medical records report that plaintiff performed wrist curls, forearm curls, shoulder presses and bench presses, exercises inconsistent with his testimony. (Tr. at 772.)

Finally, in a briefly stated argument, plaintiff complains that the ALJ failed to discuss the VA decision awarding him disability benefits, contrary to SSR 06-3p. That Ruling provides:

> Because the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner, we are not bound by disability decisions by other governmental and nongovernmental agencies. In addition, because other agencies may apply different rules and standards than we do for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency. However, the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases.

See also 20 C.F.R. §§ 404.1504 & 416.904 (stating that disability decisions made by other governmental agencies under their rules are not binding on the SSA).

Consistent with these regulations, the Seventh Circuit has held that the SSA should give VA disability pension determinations "some weight" in considering a claimant's application. Allord v. Barnhart, 455 F.3d 818, 820 (7th Cir. 2006) (citing Davel v. Sullivan, 902 F.2d 559,

36

560-61 n.1 (7th Cir. 1990)).  However, because such determinations are not binding on the SSA, and because the VA requires less proof of disability than does the SSA, they are not entitled to "great weight" in determining disability under the Social Security Act.  Id.

In the present case, the ALJ mentioned that plaintiff had been awarded VA benefits (Tr. at 17), but she did not further discuss that determination.  Nevertheless, such failure was harmless.  As the Allord court noted, such decisions are not entitled to great weight because they are based on a more lenient standard.  In its brief, two-page decision on plaintiff's claim, the VA provided virtually no explanation as to why it found plaintiff disabled.  The decision noted that plaintiff's prior work experience was in manual labor, with no qualifications for sedentary work.[18]  (Tr. at 300.) However, during the SSA hearing, the VE considered plaintiff's lack of transferrable skills and nevertheless identified unskilled sedentary jobs he could perform.  (Tr. at 1358-60.)  The VA decision went on to summarize certain records from September 10 to December 27, 1999 (Tr. at 300-01), a period of time outside plaintiff's disability "window" of January 27, 2000 to December 31, 2002 (Tr. at 20).  The records reviewed by the VA recorded plaintiff's "mild discomfort secondary to low back pain" and use of a cane (Tr. at 300), "no evidence of acute right L2-S1 radiculopathy" (Tr. at 300), "bilateral ankle swelling and pain" (Tr. at 300), diabetic management and improved breathing when he quit smoking (Tr. at 300), puffy ankles with no pain on range of motion testing, and an x-ray revealing no active pulmonary disease (Tr. at 301).  The VA further noted that plaintiff's exercise program for weight management was limited by leg pain.  (Tr. at 301.)  The ALJ was

_____

[18]At the end of the decision, the VA stated that plaintiff was going to school, presumably to obtain employment in a field that is not physically demanding; thus, the VA indicated that its decision was not permanent and would be reviewed in the future.  (Tr. at 301.)

37

aware of these records, which do not in any event present any compelling evidence of disability. The VA then briefly summarized its disability standard, before concluding: "In light of the evidence as a whole, it is found that the veteran is entitled to a permanent and total rating for pension purposes effective June 16, 1999." (Tr. at 301.) Because the VA provided no explanation for how the records it summarized supported this conclusion and made no finding on plaintiff's credibility, I see no likelihood that the ALJ would reconsider her decision based upon the VA decision. Therefore, because there is no reason to believe that remand for consideration of the VA decision might lead to a different result, <u>Fisher</u>, 869 F.2d at 1057, I decline to so order.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 22nd day of May, 2007.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

38